UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION


IN RE:

ALICIA CARINA DALCOURT                              Chapter 7

     Debtor.                              Bankruptcy No. 05-04241S
_____

AMERICAN NATIONAL BANK

     Plaintiff

vs.                                       Adversary No. 05-9162S

ALICIA CARINA DALCOURT

     Defendant.


DECISION RE:
<u>DETERMINATION OF DISCHARGEABILITY</u>

     American National Bank (Bank) asks the court to determine

that its claim against Alicia Dalcourt is excepted from

discharge.  Trial was held September 20, 2006 in Sioux City.

David J. Koukol appeared as attorney for Bank.  Martha McMinn

appeared as attorney for Dalcourt.  This is a core proceeding

under 28 U.S.C. § 157(b)(2)(I).


<u>Stipulation as to Testimony</u>

     The parties stipulated that if called to testify, Gregory

Keholm, Vice President and Manager of Consumer Collections for

American National Bank and Thomas Patton, Underwriter for

American National Bank, would testify to the following facts:

1. Plaintiff American National Bank ("Bank") is a National Banking Association with its principal place of business in Omaha, Douglas County, Nebraska.  The Bank is authorized to conduct business in the States of Iowa and Nebraska.

2. Plaintiff loaned Defendant $32,632.50 for Defendant's purchase of a 2005 Kia Sorento, VIN #KNDJC733155406423 (the "Vehicle"), pursuant to a Retail Installment Contract and Security Agreement ("Agreement") dated August 12, 2005.

3. Defendant purchased the Vehicle from Lake Manawa Nissan, Inc. ("Dealer") with financing provided by Plaintiff.  As a part of the sale transaction, a credit application was completed by the Defendant at the Dealer's place of business in Council Bluffs, Iowa.  The Plaintiff was not involved in obtaining the information contained in the application, and relied solely on the Dealer and Defendant for accurate information on which its decision to make the loan was made.  The data contained in the completed application was submitted to Plaintiff along with other information by the Dealer with a request that Plaintiff finance Defendant's purchase of the Vehicle.  Based upon the Defendant's financial information that was received by the Plaintiff from the Dealer, Plaintiff approved the loan application and loaned Defendant the purchase price of the Vehicle.

4. The information Plaintiff was provided by the Dealer showed that the Defendant's monthly salary was $4,200.00 per month.  This salary amount was crucial to Plaintiff's decision to provide Debtor financing for the purchase of the Vehicle.

5. Defendant filed a Chapter 7 Bankruptcy on September 1, 2005, less than three weeks after purchasing the Vehicle.

6. Schedule I to Defendant's voluntary petition reported that her gross monthly salary was $2,189.20, which is significantly less than the $4,200.00 gross monthly salary contained in Debtor's credit application.

7. Plaintiff's procedures for financing the purchase of a vehicle from a dealer involve the following steps:

   a. Dealer and Customer complete a credit application, which the Customer signs.  The dealer inputs the data from the credit application into a

2

computer program called "DealerTrack" and the data
is then electronically transmitted to Plaintiff.
Upon receipt of the data, the Plaintiff pulls
credit bureaus on the Customer and the entire
"package" is transmitted to the Plaintiff's
underwriters.  The Plaintiff's underwriter makes a
decision to extend or deny credit based upon the
information provided.  If the loan application is
approved, Dealer draws on the bank via a physical
draft in the amount of the contract that is
deposited into the Dealer's account.  The Dealer's
original paperwork involving the sale transaction
and the loan application is forwarded to
Plaintiff, and Plaintiff eventually gets the
original loan application and the original
certificate of title to the vehicle with the
Plaintiff's lien noted thereon.

        b. This procedure was followed by the Plaintiff
with regard to the Debtor's loan application for
financing the purchase of the Vehicle.

        c. The data Plaintiff received electronically
matches the data contained in the paper credit
application Plaintiff received from the Dealer.

    8. Based upon Defendant's monthly income of $2,189.20,
Defendant's debt to income ratio would be 79%.

    9. Based upon Defendant's monthly income of $4,200.00,
Defendant's debt to income ratio would be 43%.

    10. Based upon the underwriting procedures in place at the
time Plaintiff made the loan to Defendant for the purchase
of the Vehicle, had the Defendant's income been shown on the
credit application as $2,189.20 rather than the $4,200.00
that was actually presented, Defendant's debt to income
ratio would have been 79%, versus 43%, and Plaintiff would
not have financed the Defendant's purchase of the Vehicle
with a debt to income ratio of 79%.

    11. Defendant's application would have been denied and
Plaintiff would not have financed the Defendant's purchase
of the Vehicle had the application Plaintiff received shown
her gross monthly salary to be $2,189.20, because a 79% debt
to income ratio would have exceeded the Plaintiff's
threshold ratio.

12. Debtor surrendered the Vehicle to the Plaintiff and it
was sold on January 25, 2006 for $17,200.00.  After applying
the net sale proceeds of $16,693.10, the principal balance
due Plaintiff from Debtor is $15,339.40 as of May 23, 2006,
plus interest accruing at the contract rate of 7.64% per
annum, plus attorneys fees and costs as allowable pursuant
to 11 U.S.C. §523(D) and any other applicable law.

Findings of Fact and Conclusions of Law

Dalcourt is 26 years old and lives in Sioux City.  She is

employed as a slot technician by Argosy Casino in Sioux City.  In

2004 she purchased a 2004 KIA Sorento 4 x 4 automobile from Lake

Manawa Nissan, Inc. in Council Bluffs, Iowa (Dealer).  To

purchase it, she traded in a 2001 KIA Sportage automobile that

she had purchased from the same dealer.

During the summer of 2005 she received a mailing from Dealer

advertising a "buy back" promotion to sell her a new KIA.

Dalcourt and her boyfriend, Travis Moyer, drove down to Dealer's

place of business on August 12, 2005.  She had not been

considering the purchase of a new car but decided to look at cars

after receiving the mailing.

Dalcourt dealt with Ernie Hope, a salesman at Dealer.  Hope

had been the salesman for her previous purchase.  Moyer recalls

that Dalcourt was first interested in a KIA Sportage.  Hope says

she might have been.  Dalcourt filled out a credit application,

and while she did, Hope wrote up a purchase order.

Moyer remembers that Dalcourt was turned down for the

4

purchase of the Sportage.  Hope says that might be so.  Dalcourt

then offered to purchase a 2005 Sorento EX model, and that model

might have been suggested as being affordable by Dalcourt.  Hope

filled out another purchase order, a "Retail Order For A Motor

Vehicle" on the Sorento (exhibit 5, p. 0003).  The order stated

that Dalcourt would buy that day "if terms are agreeable" (id.).

Hope took the credit application and the order to his boss,

Jim Schmitte, the sales manager.[1]  Hope did not look at the

information on Dalcourt's credit application.  Hope then obtained

a trade-in figure for Dalcourt's automobile from someone else at

Dealer, and provided that information to Schmitte.  Also at that

time a credit (bureau) report on Dalcourt was obtained.  After

examining the paperwork, Schmitte approved price terms on the

purchase, estimated the monthly payments for the term of the

loan, and Hope conveyed the information to Dalcourt (see exhibit

5, p. 0003).  She agreed to the basic terms of purchase, and she

and Hope went to the finance department to work out financing.

At finance, Dalcourt first met with the head of the

department, Ian Duffy.  He checked that all the necessary

information was in her "deal jacket," a sales file, and put some

of the sales figures into the computer to enable himself to

submit a financing application to lenders.  Duffy says there was

---

[1] The court is unsure of the correct spelling of the sales
manager's name.

one credit application in the file when he reviewed it, and it
was the one filled out by Dalcourt when she began working with
Hope.

Duffy took Dalcourt to Brian Schmidt, a "producer," for the
completion of more paperwork, including the sales contract and
the note and security agreement.  Schmidt also prepared a
checklist to make sure all necessary documents were in the deal
jacket.  When Schmidt met with Dalcourt, Moyer was in the room
with them.  At that time, Schmidt says a second credit
application was prepared.  According to Schmidt and Duffy, this
is not unusual.  It is generally done to remove financial
information on any additional applicants that are not going
forward as purchasers, to correct mistakes, or to clarify
illegible information.  Schmidt does not remember specifically
why it was done in Dalcourt's case.

The second application, in Dalcourt's purchase, is exhibit 2
(also exhibit 5, p. 0002).  Schmidt says he took the information
from Dalcourt, and when the document was completed, she signed
it.  Schmidt, however, cannot identify all of the handwriting on
the application.  He says he wrote in the name of one of her
references, and scratched out the word "annual" in reference to
Dalcourt's gross salary.  He said he did this because the salary
was monthly.  He is unable to say who wrote the salary figure of
"$4,200.--."  He testified that "maybe" he filled in other blanks

on the form.

Dalcourt denies that she signed a document that had been filled out with information which she provided.  She says she signed the document in blank form at Schmidt's request.  Dalcourt testified that he told her it had something to do with a credit card offer.  Moyer agrees that the application was blank when Dalcourt signed it.  Schmidt says that he did not ask Dalcourt to sign a blank document.

Dalcourt agrees that $4,200.00 was not her monthly gross salary.  She says also she was not a manager as stated on exhibit 2, but only a slot technician.  She says that at the time she was earning somewhere between $10.96 and $12.00 per hour, and that her monthly gross was approximately $2,000.00.  She says it was approximately the same as what it was when she purchased the trade-in car from Dealer, "give or take some raises."  When she filed bankruptcy on September 1, 2005, she scheduled her monthly gross salary as $2,189.20 (exhibit 4).  Exhibit 2 also shows Dalcourt's home mortgage payment as "0."  There is no explanation of this.

The initial financial statement, filled out by Dalcourt, was destroyed by shredding.  Duffy and Schmidt testified that this is standard procedure when a financial application is superseded by another.  Dealer does not want an application "not pertinent to the final deal" to remain in the file if it is not the

application on which the lending is based.  They say this is to protect the customer's privacy.  Neither Schmidt nor Duffy remember what was in Dalcourt's initial application, and neither has any personal knowledge as to any representation therein of Dalcourt's earnings.

It is uncertain who shredded the initial application.  Duffy testified that when the deal jacket was returned to him the second, and final, time, the initial application was not in the file.  Schmidt at first testified that the initial application was shredded by Duffy or him, but later testified that he himself did not shred it.

Schmidt prepared the Motor Vehicle Purchase Agreement (exhibit 5, p. 0014) and the note and security agreement (exhibit 5, p. 000015).  He obtained Dalcourt's signatures on these documents.  The cash price of the new vehicle, with all fees and charges, was $32,632.50 (exhibit 5, p. 0014).  Dalcourt had negative equity in her trade-in vehicle.  Part of the amount financed on the new car was the payoff of her outstanding vehicle loan to Harris Bank Barrington (exhibit 5, 000040).

Dalcourt's first payment on the car loan was not to be until December 10, 2005.  Schmidt says this was requested by Dalcourt. She denies this, saying that she understood the delay in payment was caused by the time it took to arrange for direct withdrawal of payment from her bank account.  The first payment date is

8

relevant, according to Dealer, because it had a determinative effect on who the lender would be.  Schmidt believed that American National Bank was the only lender with whom Dealer worked that would agree to the later start of payments.  The delay-in-payment term of the loan increased the interest rate of the loan by a quarter of a percent (exhibit 5, p. 0013).

Sometime during the purchase transaction, someone at Dealer obtained Dalcourt's signature on Supplement To Original Sales Agreement (exhibit 5, p. 0012).  Numbered paragraph 5 of the Supplement stated that the salesman had not promised anything that was not in writing.  Also, paragraph 13 stated: "I/WE HAVE NOT SIGNED ANY BLANK DOCUMENTS AND UNDERSTAND EVERYTHING I/WE HAVE SIGNED" (entire document typed in capital letters). Dalcourt does not remember whether she signed the document before or after she signed the second credit application.

At the close of the transaction, Hope visited again with Dalcourt, delivering and demonstrating the vehicle and filling out a New Vehicle Checklist (exhibit 5, p. 000026).  Dalcourt and Moyer left with the new car.  It would not be until later that Dealer finalized the financing, but the sales documents had been based on American National Bank's guidelines to Dealer as to rates.  The deal jacket would have been delivered to Duffy by Schmidt for submission of the loan assignment application to the lender by the finance department.  Duffy says that when the file

was returned to him, the initial credit application filled out by
Dalcourt was no longer in the file as it had been replaced by the
final credit application.  The assignment application was
submitted to American National Bank by computer using the
DealerTrack program.  The assignment was made without recourse to
Dealer (exhibit 5, p. 000015).  Confirmation of the financing was
faxed to Dealer on August 13 (exhibit 5, p. 0013).  It was in
substantial conformance with the note (exhibit 5, p. 000015).
The only difference was that in the note the amount financed was
$600.00 greater because of a "GAP" insurance premium.  After the
confirmation of financing, the Dealer's finance department sent
the deal jacket to the Dealer's business office for completion of
the title work and to mail the contracts to the lender.

Dalcourt filed her chapter 7 bankruptcy petition on
September 1, 2005, twenty days after purchasing the new car.  She
said she first considered filing a week or two after the purchase
because she was going through paperwork and bills and realized
that financially "it wasn't working."  She first visited with her
bankruptcy attorney either on the day she filed or the day
before.  Dalcourt made no payments on the car loan.  The date of
her filing was not determined by the pressure of any type of
legal process such as foreclosure, garnishment or levy.

The Dealer retains the deal jackets for its sales.  Exhibit
5 contains the deal jacket information for the 2005 sale to

Dalcourt and for the 2004 sale.  The 2005 portion of the file did

not contain the initial credit application because it had been

shredded upon Dealer's obtaining a subsequent application

(exhibit 2).  The 2004 portion of the file did not contain any

credit application in support of Dalcourt's purchase of the 2004

KIA.

     Bank contends that its claim should be excepted from

Dalcourt's discharge under either 11 U.S.C. § 523(a)(2)(A) or §

523(a)(2)(B).  The Bankruptcy Code provides that a discharge

under section 727 does not discharge an individual debtor from

any debt--

> (2) for money, property, services, or an extension,
> renewal, or refinancing of credit, to the extent obtained,
> by--
>
> > (A) false pretenses, a false representation, or
> > actual fraud, other than a statement respecting
> > the debtor's or an insider's financial condition;
>
> > (B) use of a statement in writing–
> >
> > > (i) that is materially false;
> > >
> > > (ii) respecting the debtor's or an insider's
> > > financial condition;
> > >
> > > (iii) on which the creditor to whom the
> > > debtor is liable for such money, property,
> > > services, or credit reasonably relied; and
> > >
> > > (iv) that the debtor caused to be made or
> > > published with intent to deceive;

11 U.S.C. § 523(a)(2)(A) and (B).

     Because subsections 523(a)(2)(A) and (B) are mutually

exclusive, Bank's claim may be excepted from discharge under only

one of them.   I conclude that the credit application, exhibit 2,

is a statement in writing respecting the debtor's financial

condition.   It is a statement of Dalcourt's ability to generate

income.   Cadwell v. Joelson (In re Joelson), 307 B.R. 689, 696

(B.A.P. 10th Cir. 2004), aff'd, 427 F.3d 700 (10th Cir. 2005),

cert. denied, 126 S.Ct. 2321 (2006).   Coupled with the credit

bureau report, the credit application provided an overall view of

Dalcourt's ability to pay the debt.   First Federal Bank v. Mulder

(In re Mulder), 306 B.R. 265, 271 (Bankr. N.D. Iowa 2004).

Bank's claim, if to be excepted from discharge, must be excepted

under 11 U.S.C. § 523(a)(2)(B).

The application's statements of Dalcourt's position as a

manager and her monthly gross salary of $4,200.00 were materially

false.   Bank reasonably relied on the statement of  Dalcourt's

monthly gross income.   The salary information was material.

Based on the income's relationship to Dalcourt's debts as shown

in the credit report, Bank made its determination to take an

assignment of the note.   The application was published, or made

indirectly, to Bank.   Dalcourt knew that her credit application

would be sent to a lender for purposes of the lender's

consideration of loaning money on her car purchase.

The issue here is whether Dalcourt made the false statement.

She says she signed the statement in blank at Schmidt's request.

She said he told her it was part of a credit card offer.  There
are aspects of her testimony that are troublesome.  First, the
credit application contained blanks regarding proposed financing
terms and blanks for a vehicle's description.  It indicates that
one option is vehicle leasing.  Nothing relates to issuance of a
credit card.  On the other hand, the credit application form
Dalcourt had filled out earlier was a longer form than exhibit 2.
It may have been reasonable to think that a different form had a
different purpose.  Second, Dalcourt signed a document stating
that she had not signed any blank documents.  She says she does
not recall if she signed that document before or after signing
the blank credit application.  Either way, it somewhat undercuts
her contention that she signed a blank application.  Either the
assertion that she signed no blank documents was not true, or her
statement did not prevent her from signing a blank document
later.  One would think it would have caused her to pause with
concern, if she were presented with a blank document to sign.

    Bank's claims about the execution of the blank document are
not without their weaknesses.  First, Bank was not there.  It is
relying on the Dealer's assertions.  Dealer must have wanted
Dalcourt to buy a new car.  Dealer was in charge of the
paperwork.  A significant document is missing--the initial credit
application filled out by Dalcourt.  It is a document that
contained similar, and perhaps more, financial information.

There is no doubt she filled it out on her own.  A comparison
between it and the final application would likely show whether
the information on the final application was provided by
Dalcourt.  However this document was destroyed by Dealer.
Dealer's witnesses can make educated, policy-based guesses on why
the second application was created, but no one knows for certain.
None of Dealer's employees involved in the transaction remembers
what was in the original application, or why it was superseded.
Indeed, no one can explain why there is no existing credit
application from Dalcourt's 2004 Sorento purchase.

Moyer supports Dalcourt's assertion that she signed the form
in blank.  He is likely biased in favor of his girlfriend, but
Dealer is not without a motive for denying Dalcourt's assertion.
If its employees intentionally filled out the blank application
with incorrect information, it would be liable to Bank.

Another troublesome problem with the evidence relates to the
debt to income ratio standards used by Bank in making its car
loans.  It says a 43 per cent ratio is sufficient to make the
loan, but that a 79 per cent ratio is not.  Dealer was aware of
certain of Bank's lending guidelines.  Was it aware of this one?
There is no evidence it was.  But if it was not, how could
Dalcourt have been?  If she provided a monthly gross income
figure of $4,200.00 to get the loan on the Sorento, was it a
guess?  If it was sufficient to obtain lending on the Sorento, to

what extent did it cause her to be rejected on the Sportage?  One
more matter worthy of consideration is Dealer's examination of
the initial credit application.  Clearly it must have examined
it, because at least someone employed by Dealer found it wanting
and required the preparation of a second application.  If the
figure changed from the initial one to the final one, Dealer
would have known.  If the two were the same as to her monthly
gross income, it would have been helpful to know why $4,200.00
per month in gross income--a 43 per cent debt to income ratio--
did not support her purchase of the Sportage.

    Some facts that might have been helpful were not proven.
Those that were proven, all in all, have not helped the court
make up its mind.  The burden in this case is on the plaintiff to
prove the elements of the exception by a preponderance of the
evidence.  This standard of proof requires Bank to prove that
Dalcourt more likely than not made the false statement regarding
her job title and her monthly gross income.  McCorkindale v.
American Home Assurance Company, 909 F.Supp. 646, 653 (N.D. Iowa
1995).  It is a "more-likely-than-not" standard.  Glastetter v.
Novartis Pharmaceuticals Corp., 252 F.3d 986, 991 (8th Cir.
2001).

    Bank's attorney says the resolution of the issue depends on
a determination of the credibility of the witnesses.  I cannot
determine who is telling the truth.  There are more than two

15

possibilities.  One--and two--Dalcourt may have signed a blank

credit application, and someone at Dealer filled it out, (1)

intentionally or (2) unintentionally, with the wrong information.

Three, Dalcourt may have given someone at the Dealer incorrect

information of job and salary.  If she did, it was done knowingly

and with fraudulent intent.  There is too much missing

information for me to determine which one is most likely.

     If the evidence is such that the court is unable to make a

decision on a relevant fact issue, one way or the other, the

party with the burden of proof loses.  <u>Texas Distributors, Inc.

v. Local Union No. 100</u>, 598 F.2d 393, 402 (5th Cir. 1979).  It is

so in this proceeding.  I realize that Bank is an innocent party,

one that relied on the honesty and precision of Dalcourt and

Dealer.  Bank was not at the transaction.  It merely took in the

information and made its lending decision on it.  It also does

not know which version of the facts, more likely than not, is

true.

     Bank has failed to prove by a preponderance of the evidence

that Alicia Dalcourt made or published to Bank a false statement

in writing as to her financial condition.  Its complaint will be

dismissed.

IT IS ORDERED that the complaint of American National Bank against Alicia Dalcourt is dismissed.  Judgment shall enter accordingly.

DATED AND ENTERED <u>OCTOBER 6, 2006</u>

William L. Edmonds, Chief Bankruptcy Judge